# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Sara Gleaton, as Personal Representative of the Estate of
Wilton Gleaton, Appellant,

v.

Orangeburg County, a Political Subdivision of the State
of South Carolina, Respondent.

Appellate Case No. 2020-001006

———————

Appeal From Orangeburg County
James B. Jackson, Jr., Master-in-Equity

———————

Opinion No. 6003
Heard May 9, 2023 – Filed July 26, 2023

———————

## REVERSED AND REMANDED

———————

William Franklin Barnes, III, of Barnes Law Firm, LLC,
of Hampton; and John E. Parker and John Elliott Parker,
Jr., both of Parker Law Group, LLP, of Hampton, all for
Appellant.

Jerrod Austin Anderson, of Anderson Law Office, P.A., of
Orangeburg; and Andrew F. Lindemann, of Lindemann
Law Firm, P.A., of Columbia, both for Respondent.

———————

**HEWITT, J.:**  This is an appeal in an action for slander of title.  The story began
with a flawed tax sale, but there were several mistakes for years after.  The
master-in-equity found in favor of Orangeburg County (the County) based on
findings that the County did not publish a false statement impugning the owner's title

and did not act with malice. We agree with the owner's arguments that the record does not support the master's findings and that the master did not apply the proper legal standard. Therefore, we reverse and remand.

## FACTS

Bank of America (the Bank) began foreclosure proceedings in 1998 on property owned by Debra Foxworth. The foreclosure was finalized in 1999. The Bank bought the property at the foreclosure sale and recorded its deed that July.

The next month, in August 1999, the Bank sold the property to Wilton Gleaton. Wilton recorded his deed later that month and filed it with the County assessor two days later.

Wilton believed he bought the property free and clear of any delinquent taxes. However, at the time Wilton bought the property, the 1998 taxes had not been paid.

The County began delinquency proceedings in March 1999. It sent Foxworth notices for failing to pay the 1998 taxes in March and May. As those dates indicate, this was shortly before the foreclosure sale to the Bank, but long after the Bank started its foreclosure case against Foxworth.

The unpaid 1998 taxes did not get discovered and resolved during the two sales of the property that happened in 1999: the foreclosure sale to the Bank and the Bank's sale to Wilton. In February 2000—roughly six months after Wilton bought the property from the Bank—the County sold the property at a delinquent tax sale to James Fields.

Over the next several months, the County's delinquent tax collector sent three "Dear Property Owner" letters to give the required notice of the period to pay the unpaid taxes and redeem the property. Even though Wilton was the record owner, two of the three letters were addressed to Foxworth. The last of the three letters was addressed to Wilton. Still, this letter, like the two previous letters, was sent to Foxworth's last known address. Wilton's name and Foxworth's address were handwritten across from where Foxworth's name and address had been printed and crossed out.

This issue somehow remained unresolved even though Wilton's wife, Sara, visited the County in January 2001—before the redemption period expired—and went there precisely because she had not received a tax notice in the mail. She paid the 2000

property taxes after the County provided her a copy of the 2000 tax bill. That tax bill listed a Charleston address at which neither Sara nor Wilton had ever lived. Sara gave the County her correct address during this encounter and asked if there were any other taxes owed on the property. The County initially told her that no other taxes were due at that time but subsequently informed her the 1999 taxes had not been paid. She paid those taxes the next month, in February 2001. The County did not inform her of the 2000 tax sale to Fields or of the right to redeem the property from that sale.

The redemption period expired in February 2001, not long after Sara paid the 2000 property taxes, but before she paid the 1999 taxes. In May 2001, the delinquent tax collector issued a tax deed to Fields, which Fields promptly recorded. The tax deed listed Foxworth as the defaulting taxpayer and the "record owner against whom warrant was issued." The tax deed made no reference to the Gleatons.

Years passed. The Gleatons received annual tax bills for the property from 2001 forward and paid them.

In August 2006, the delinquent tax collector discovered that Wilton—the record owner at the time of the 2000 tax sale—had not been properly noticed. The tax collector then worked to reverse the sale but instructed Fields to convey the property back to Foxworth, not the Gleatons, via a quitclaim deed. An employee with the County's delinquent tax office testified that the office "reversed" the tax sale and instructed that the property should be quitclaimed back to Foxworth despite knowing that Wilton was the record owner. Employees of the delinquent tax office served as witnesses for the quitclaim deed. The Gleatons were not notified about any of this.

In 2007, the Gleatons listed the property for sale. In October 2009, Donnie and Connie Hall agreed to purchase the property for $33,000. The Halls discovered Fields' quitclaim deed to Foxworth during the title search. The Gleatons met with the County. The County's attorney offered to bring a declaratory judgment on the Halls' behalf seeking rulings that the tax sale and quitclaim deed were void. Wilton filed this suit against the County after the Halls chose not to purchase the property. The case was referred to the master.

In December 2014 and after a hearing, the master issued an order finding the delinquent tax sale to Fields was flawed and invalid due to lack of proper notice to Wilton. The master found the tax deed issued to Fields was improper and that the tax sale was derogatory to the title Wilton received from the Bank. The master ruled the tax deed to Fields and Fields' subsequent quitclaim deed to Foxworth were null

and void, but took the issues of liability and damages under advisement and ordered the Gleatons to attempt to sell the property within four months. The master left open the issue of "additional relief sought by either party to help with the sale of the property." Wilton died shortly after the master issued this order and Sara was substituted as a party.

The property did not sell. The master held a second hearing in April 2017 and issued its final order in December 2019.

The final order appears to be controlled by the master's findings that the County's actions were not malicious. The master found the County did not know the Gleatons owned the property and wrote that the County had the right to conduct the tax sale to Fields because the 1998 taxes had not been paid. The master found the County "made no publication" that was intended to harm the Gleatons and made no statement that was knowingly false or in reckless disregard of its truth or falsity. The master also wrote that the County's efforts were "focused on collecting taxes for which [it] *may* be immune from liability" under section 15-78-60(11) of the South Carolina Code (2005) (emphasis added) of the South Carolina Tort Claims Act.

The master found the only statement slandering Wilton's title was the quitclaim deed from Fields to Foxworth, and that this was done for the purpose of returning the property to the defaulting taxpayer, not for the purpose of damaging Wilton's title. The master found that a proper title search when Wilton bought the property from the Bank would have revealed the 1998 taxes were due and owing.

## STANDARD OF REVIEW

"In an action at law, on appeal of a case tried without a jury, the findings of fact of the judge will not be disturbed upon appeal unless found to be without evidence which reasonably supports the judge's findings." *Townes Assocs., Ltd. v. City of Greenville*, 266 S.C. 81, 86, 221 S.E.2d 773, 775 (1976), *abrogated on other grounds by In re Est. of Kay*, 423 S.C. 476, 816 S.E.2d 542 (2018).

## SLANDER OF TITLE

There are several points to Sara's argument that the master erred in ruling for the County. One, she asserts the master erred in finding the only slanderous statement was in the quitclaim deed from Fields to Foxworth. As she sees it, the deed from the tax sale and the subsequent quitclaim deed to Foxworth purported to transfer title to third parties and publicly represented that someone else owned the property—

things that obviously disparaged Wilton's title. Two, she argues the County plainly knew Wilton owned the property because the deed and mortgage on the property were properly recorded with the County's register of deeds well before the County's tax deed to Fields. Three, Sara argues the master erred in failing to find malice because malice, in a slander of title action, includes publications made without legal justification. Four, Sara argues the Halls plainly refused to purchase the property due to this cloud on the title.

"Slander of title is grounded in the tort of injurious falsehood." *Pond Place Partners, Inc. v. Poole*, 351 S.C. 1, 19, 567 S.E.2d 881, 890 (Ct. App. 2002). Our history with this claim is relatively brief. Precedent has relied heavily on the Restatement (Second) of Torts, which provides the guidelines that "modern courts generally follow in identifying the elements of slander of title." *Huff v. Jennings*, 319 S.C. 142, 149, 459 S.E.2d 886, 891 (Ct. App. 1995). This court set out the elements of a slander of title claim in *Huff*, stating that "to maintain a claim for slander of title, the plaintiff must establish (1) the publication (2) with malice (3) of a false statement (4) that is derogatory to plaintiff's title and (5) causes special damages (6) as a result of diminished value of the property in the eyes of third parties." *Id*.

Here, the master ruled the County's actions did not result in any publication and did not contain any statement that was knowingly false or made in reckless disregard of its truth. The master determined that Fields' quitclaim deed to Foxworth was the only statement derogatory of Wilton's title. No evidence supports these findings.

The three redemption period letters sent by the delinquent tax collector, the tax deed to Fields, and the quitclaim deed that the County facilitated from Fields to Foxworth are all published statements that demean Wilton's status as the property's true owner. *See* Restatement (Second) of Torts § 630 cmt. b (Am. L. Inst. 1977) ("The manner in which the injurious falsehood is communicated is immaterial. It is generally communicated by words written or spoken that assert the statement. Disparaging matter is often published by filing a mortgage or other lien for record. As in the case of libel or slander, there may be a sufficient publication by any form of conduct that is intended to assert or is reasonably understood as an assertion of a disparaging statement."); Restatement (Second) of Torts § 629 cmt. c (Am. L. Inst. 1977) ("A common form of disparagement of another's property in land or other things is by the express denial of the other's title. Another common form is the indirect denial of another's title by the assertion of an inconsistent title in one's self or a third person."). As for knowing falsity and reckless disregard, beyond the obvious fact that Wilton was the record owner throughout the time period, there is the fact that Sara paid the 2000 property taxes in person, specifically requested information on

any unpaid taxes for the subject property, and updated her address with the County, yet the County later engineered a quitclaim deed to someone else.

Sara also challenges the master's ruling regarding malice. The master found that malice requires an intent to injure; however, in a slander of title case, malice includes a defendant making a slanderous statement, without a legal basis for doing so, that the defendant should recognize would result in harm to the plaintiff's interest. *See Pond Place Partners, Inc.*, 351 S.C. at 21, 567 S.E.2d at 891 ("One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if (a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and (b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." (quoting Restatement (Second) of Torts § 623A (Am. L. Inst. 1977))).

It seems evident that the County was at least reckless in failing to notify Wilton—the record owner—of the right to redeem the property during the redemption period. Again, we note that Sara paid the 2000 property taxes in person and specifically requested information on any unpaid taxes after the tax sale to Fields and before the end of the one-year statutory redemption period. The County only informed her of the unpaid 1999 taxes, which she promptly paid within a few weeks. When the County realized the owner of record at the time of the tax sale (Wilton) had not been properly noticed of the tax sale, the County had Fields deed the property back to the defaulting taxpayer—Foxworth—instead of informing Wilton and resolving the situation in a logical and reasonable manner.

These errors require reversal and a remand for the master to consider each element in a slander of title action and the proper standard for malice.

## SOVEREIGN IMMUNITY

The County argues that we should affirm the master's decision under the two-issue rule because Sara has not challenged the master's ruling that the County was immune from suit. The County argues that even if this court determines the master did not definitively rule on immunity, this court could use immunity as an additional sustaining ground.

The master did not rule on immunity. The final order contained the observation that "[t]he [County's] efforts were focused on collecting taxes for which [it] *may* be immune from liability." (emphasis added). *See* § 15-78-60(11) ("The governmental

entity is not liable for a loss resulting from . . . assessment or collection of taxes or special assessments or enforcement of tax laws . . . .").  The word "may" suggests the master believed the County might be immune from liability, but this was not a ruling by the master on this issue.  A bedrock part of error preservation is that an issue must have been ruled upon in the trial court in order for it to be preserved for appellate review.  *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998).  Without a ruling, there is nothing for us to review.  More importantly, without a ruling, there was nothing for Sara to appeal.  Thus, there is no two-issue rule question.

**THE MASTER'S 2014 ORDER**

There is much discussion in the briefs about whether the order that the master issued in 2014 is a "final order" and whether the master's last order in the case was faithful to the findings in that order.  The 2014 order was the order finding the tax sale, deed to Fields, and quitclaim deed to Foxworth were void.  It also instructed Wilton to try and sell the property.

This order was plainly interlocutory.  Although designated as "final" on the cover page, it did not decide the entire case and explicitly stated that "liability and damages" remained under review.  *See Ex parte Wilson*, 367 S.C. 7, 12, 625 S.E.2d 205, 208 (2005) ("Any judgment or decree, leaving some further act to be done by the court before the rights of the parties are determined, is interlocutory and not final.").  Having said that, we do not see any factual inconsistencies between this order and the master's last order.  We read the master's last order as being driven by the master's finding that the County did not act with malice.  As noted above, the master did not apply the proper standard for malice, necessitating our reversal and a remand.

**CONCLUSION**

Based on the foregoing, the master's order is

**REVERSED AND REMANDED.**

**THOMAS and MCDONALD, JJ., concur.**